**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 99-40502

LINDA KERSTETTER, INDIVIDUALLY,
AND AS PERSONAL REPRESENTATIVE
AND HEIR OF THE ESTATE OF DAVID JOSEPH HUBER,

Plaintiff-Appellant,

VERSUS

PACIFIC SCIENTIFIC COMPANY; ET AL.,

Defendants,

PACIFIC SCIENTIFIC COMPANY;
BEECH AEROSPACE SERVICES;
RAYTHEON AEROSPACE COMPANY;
BEECH AIRCRAFT CORP.;
RAYTHEON AIRCRAFT COMPANY,

Defendants-Appellees.

Appeals from the United States District Court
for the Southern District of Texas

April 18, 2000

Before HIGGINBOTHAM and PARKER, Circuit Judges; and WARD, District Judge.[1]

ROBERT M. PARKER, Circuit Judge:

Plaintiff-Appellant brought suit on behalf of her son, a deceased naval pilot, contending that the pilot restraint system in the T-34C aircraft he was flying at the time of his death was defectively designed. The defendants moved for summary judgment

---

[1] District Judge of the Eastern District of Texas, sitting by designation.

-1-

based on, *inter alia*, the government contractor defense. Because we find that the government contractor defense applies and that no genuine issues of material fact exist which would preclude summary judgment, we AFFIRM.

### PROCEEDINGS BELOW AND FACTUAL HISTORY

This case arises from the 1995 death of Navy instructor pilot Lt. David Joseph Huber, who died while conducting a familiarization flight with a student pilot off Padre Island, Texas. Lt. Huber was inadvertently ejected from a T-34C aircraft during a training maneuver when his pilot restraint system ("PRS") released without command.[2] Pacific Scientific Company ("Pacific Scientific")[3] manufactured the PRS on board the aircraft. The Navy conducted an investigation of the incident and concluded that a possible cause for the ejection was contact between the aircraft control stick grip and the rotary buckle that releases the restraint belts.

---

[2] The T-34C does not have an ejection seat. Lt. Huber was ejected when the negative G-forces created during a spin recovery maneuver propelled him through the canopy and out of the aircraft. Although Lt. Huber survived the ejection and his parachute initially functioned properly, he came out of his parachute prematurely and died from blunt force trauma upon impact with the water.

[3] Defendant Beech Aircraft Corporation ("Beech"), now known as Raytheon Aircraft Company, manufactured the aircraft in question. Defendant Beech Aerospace Services, Inc. ("BASI"), now known as Raytheon Aerospace Company, serviced the aircraft in question under contract with the Navy. For purposes of simplicity, this opinion will refer to the manufacturer of the T-34C as "Beech," to the manufacturer of the pilot restraint system as "Pacific Scientific," and to the maintenance contractor for the T-34C simply as "BASI."

In late 1973, the Navy began Phase I testing of the T-34C[4] and specifically observed several deficiencies in the pilot restraint system (PRS). The Navy concluded that these deficiencies should be corrected. In mid-1974, Phase II testing focused on the PRS and concluded in a final report that the PRS was uncomfortable and functioned poorly during negative G testing. The report recommended corrective action.

By 1975, Beech had not yet corrected the PRS difficulties identified in Phase II testing; however, Beech proposed a fifth "crotch strap" with a quick release buckle in preparation for further testing. A preliminary evaluation in September of 1976 gave this new PRS a positive evaluation. The Navy performed further tests and found that "The pilot restraint system in the T-34C airplane is an enhancing characteristic which significantly improves airplane controllability during spins and should be included in future designs." In 1982, the Navy ordered 120 T-34Cs with this "crotch strap" design. All drawings were approved by the Navy through thorough review and training sessions. Once approved, these drawings could not be modified without Navy approval. The PRS design resulting from this review and testing process was the same as that in the victim's plane.

In a 1985 Field Engineering Action Team (FEAT) meeting, Beech heard reports for the first time of a phenomenon called "uncommanded seat harness release." The next year's meeting

---

[4] The T-34C was a modification of the previous Navy flight trainer, the T-34B. The Navy used the T-34B as its basic trainer aircraft until the early 1970s.

included an agenda item regarding "uncommanded seat harness release."  This item was left open following the meeting.  This is the last time Beech heard about the problem until after the accident that resulted in the filing of this action.

The Navy instructed students training in the T-34C to position their harness buckles under their life preservers to prevent inadvertent release of the PRS and also created a form for pilots to report occurrences of inadvertent releases.[5]  The Navy took no further actions in response to this problem before the accident in this case.  After this accident, a Navy official noted that the PRS posed a "severe flight hazard."

Kerstetter brought this suit on behalf of Lt. Huber against the named defendants.  All defendants filed motions for summary judgment based on the government contractor defense and on the absence of summary judgment evidence to create a genuine issue of material fact.  The district court granted defendants' motions.

## STANDARD OF REVIEW

"We review a grant of summary judgment *de novo*."  *Kipps v. Caillier*, 197 F.3d 765, 768 (5th Cir. 1999).  A district court's award of summary judgment is reviewed "using the same standard as that employed initially by the district court under Rule 56."  *Stout v. Borg-Warner Corp.*, 933 F.2d 331, 334 (5th Cir. 1991).

---

[5]  The district court found that "if the harness is adjusted properly, the buckle is located underneath the pilot's life preserver unit so that it cannot come into contact with the aircraft's control stick.  When the buckle is in front of the life preserver unit, it is possible when the control stick is in full-aft position (as occurs during spin entry) for the control stick to contact and inadvertently release the harness."

-4-

Pursuant to Rule 56, summary judgment is appropriate only where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56. A factual dispute is "genuine" where a reasonable jury could return a verdict for the nonmoving party. *See Crowe v. Henry*, 115 F.3d 294, 296 (5th Cir. 1997). "If the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, then there is no genuine issue for trial." *Kipps*, 197 F.3d at 768.

## DISCUSSION

## I.    The Government Contractor Defense

Government contractor immunity is derived from the government's immunity from suit where the performance of a discretionary function is at issue. *See Boyle v. United Tech. Corp.*, 487 U.S. 500, 511 (1988). The Supreme Court has noted that "the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function." *Id.*

In order for a contractor to claim the government contractor defense, (1) the government must have approved "reasonably precise" specifications; (2) the equipment must have conformed to those specifications; and (3) the supplier/contractor must have warned of those equipment dangers that were known to the supplier/contractor, but not to the government. *See Boyle*, 487 U.S. at 512; *Stout*, 933 F.2d at 336.

The government need not prepare the specifications to be

-5-

considered to have approved them.  *See Trevino v. General Dynamics*, 865 F.2d 1474, 1480 (5th Cir. 1989) (holding that "substantive review" is adequate).  To determine whether "substantive review" occurred, a court must take into consideration a number of factors.  The factors involve examining drawings, evaluation from time to time, criticism and extensive government testing--a "continuous back and forth" between the contractor and the government.  *See In re Air Disaster at Ramstein Air Base, Germany*, 81 F.3d 570, 574 (5th Cir. 1996). The specifications need not address the specific defect alleged; the government need only evaluate the design feature in question. *See Boyle*, 487 U.S. at 512; *Trevino*, 865 F.2d at 1486 ("The government contractor defense as reformulated in *Boyle* protects government contractors from liability for defective designs if discretion over the feature in question was exercised by the government.").

Nonconformance with a specification means more than that the ultimate design feature does not achieve its intended goal.  The alleged defect must exist independently of the design itself, and must result from a deviation from the required military specifications.  *Cf. Bailey v. McDonnell Douglas Corp.*, 989 F.2d 794, 800 n.13 (5th Cir. 1993) ("For the reasons explained infra, we interpret  Boyle's statement that the defense bars '[l]iability for design defects,' to mean liability for defects in the government specifications.") (citation omitted). Extensive government involvement in the design, review,

-6-

development and testing of a product, as well as extensive acceptance and use of the product following production, is evidence that the product line generally conformed with the government-approved specifications. *See In re Air Disaster*, 81 F.3d at 575.

The third part of the *Boyle* test requires the contractor to warn the government about those equipment dangers that were known to the contractor, but not to the government. The purpose of this element is *not* to create an incentive to discover latent defects in a product designed for the government. *See Boyle*, 487 U.S. at 512 ("The third condition is necessary because, in its absence, the displacement of state tort law would create some incentive for the manufacturer to withhold knowledge of risks, since conveying that knowledge might disrupt the contract but withholding it would produce no liability."). The government contractor defense does not require a contractor to warn the government of defects about which it only should have known. "After *Boyle*, a government contractor is only responsible for warning the government of dangers about which it has actual knowledge." *Trevino*, 865 F.2d at 1487.

## II.  Plaintiff's Articulation of the *Boyle* Test is in Error

Plaintiff argues that, in the approval process, the government must have considered and rejected a safer design alternative proposed by the plaintiff, or at least must have itself prospectively limited the discretion of the contractor to include a safer alternative design. The district court noted

that this argument is well suited for presentation to Congress or to the Supreme Court rather than the district court but that it *is contrary to the case law*. *See Boyle*, 487 U.S. at 513; *Stout*, 933 F.2d at 334-35; *see also Tate v. Boeing Helicopters*, 140 F.3d 654 (6th Cir. 1998) (*Tate II*). The *Boyle* court noted that, while this is perhaps a reasonable rule of tort law, it did not sufficiently protect the federal interest in the selection of appropriate military equipment.

> The design ultimately selected may well reflect a significant policy judgment by Government officials whether or not the contractor rather than those officials developed the design. In addition, it does not seem to us sound policy to penalize, and thus deter, active contractor participation in the design process, placing the contractor at risk unless it identifies all design defects.

*Boyle*, 487 U.S. at 513. The district court noted that this last sentence can mean only that the defense applies even when the contractor did not warn the government of latent defects-in other words, defects that neither the contractor nor the government considered it at all. We agree. The articulation of the government contractor defense offered by the plaintiff is contrary to the case law.

## III. Manufacturing Defect and Negligent Inspection

The district court held that the plaintiff presented no evidence of a manufacturing defect and granted defendants summary judgment on that claim. The claim for negligent inspection presumes that a manufacturing defect existed, thus defendants

-8-

were granted summary judgment on that claim as well.[6]

Plaintiff argues that summary judgment is inappropriate because fact issues exist with regard to this count. At the heart of the plaintiff's argument is a general specification paragraph found in the approved specifications for the T-34C issued by the Navy:

> Where any vital moving part passes close to a fixed structure or item of equipment, the point nearest contact shall be located or arranged that gravity will normally clear this point of loose articles or cause them to take remote positions where they cannot jam or interfere with the moving part.

Plaintiff claims that the design of the control stick (and its ability to inadvertently unbuckle the "crotch strap" at the full-aft position) violate this specification and thus constitute a manufacturing defect. Defendants argue that the cockpit design conformed to the specifications for the cockpit.

We agree with the district court that this specification cited by plaintiffs had to do with production techniques and not with cockpit design.

## IV. Design Defect (Negligence, Strict Liability and Warranty)

Defendants claim that the government contractor defense immunizes them from liability in this case. The primary issue with regard to an alleged design defect in this case is whether the government approved reasonably precise specifications. The district court held that the unrebutted summary judgment evidence

---

[6] The district court noted that to the extent the negligent inspection claim was based on a design defect, that claim is displaced by the applicability of the government contractor defense to the design defect claim.

establishes that the government approved reasonably precise specifications for the design features in this case.

First, the T-34C originated as a modification of the T-34B, a plane the Navy had been using to train pilots for 20 years. The T-34B had the same PRS, the same control stick and the same cockpit design as the T-34C. Second, the government was extensively involved in the approval process. The record reveals a clear pattern of government-contractor interaction over at least eight years. Third, approval of the T-34C's design included the specific features at issue in this case. The defendants argue that "[t]he *defective nature* of the features may have been latent to the Navy as well as the contractors, but the features themselves were obvious to anyone who flew the T-34C." Fourth, the Navy specifically addressed the design features at issue in this case throughout the approval process.

The district court held that plaintiff's arguments that the government contract defense is not available are unavailing. First, plaintiffs argue that the defendants purchased the PRS "off the shelf." As noted by the district court, the government procurement officer did not order a quantity of restraint systems in the same way he would order light bulbs, but rather, government engineers approved the inclusion of these specific components into a complex piece of equipment. In addition, the Navy specifically tested the T-34C's PRS during its evaluation of the aircraft following Phase II testing. Furthermore, neither counsel for the plaintiff nor counsel for the defendant were able

to name or otherwise identify another aircraft which uses the PRS involved in this case.

Second, plaintiffs argue that the T-34C's PRS specifications conflict with another, more general specification. The district court held that the specifications cited by the plaintiff were not implicated by the facts of this case. The plaintiffs again refer to the "gravity clearance" paragraph in the specifications mentioned above. The argument was dismissed in the context of a manufacturing defect and is also unavailing in the design defect context.[7]

Lastly, the plaintiffs argue that the defense should not apply because the government did not actively limit the contractor's ability to develop a safer design. Basically, plaintiffs argue that a safer design could have been developed "without violating any specification." This argument focuses on an incorrect standard which is whether the government approved a specification that did not contain a safer design. The inapplicability of this standard to the case at bar has been addressed.

The defendants argue that the government approved reasonably precise specifications. They reference numerous documents involving the PRS in general and the buckle in particular. The

---

[7] *Cf. In re Air Disaster*, 81 F.3d at 575 (noting that "such a general design specification is not contemplated by the first element of the Boyle test because 'only the detailed, quantitative specification--and not those calling for such vagaries as a failsafe, simple or inexpensive product--are relevant to the government contractor defense'") (citation omitted).

-11-

"reasonably precise" standard is satisfied as long as the specifications address, in reasonable detail, the product design feature, alleged to be defective. *See Boyle*, 487 U.S. at 512; *Bailey v. McDonnell Douglas Corp.*, 989 F.2d 794, 799 (5th Cir. 1993) (noting that the specifications need not address the specific design defect alleged, just the specific feature). Defendants alternatively allege that even if the Navy is found not to have approved the PRS during T-34C design process, it did approve the allegedly defective design at issue far before the accident by subsequent testing and use.[8]  The 1985 and 1986 FEAT meetings are evidence of this.

We find that the district court's conclusion that the Navy approved reasonably precise specifications for the T-34C's seat harness was appropriate under the facts of this case.  Therefore, the government contractor defense applies.[9]

## V.    Failure to Warn

In *In re Air Disaster*, this court held that a "conflict between state law and federal policy might arise if there is evidence that the government was involved in the decision to

---

[8]  *See Dowd v. Textron, Inc.*, 792 F.2d 409, 412 (4th Cir. 1986) ("The length and breadth of the Army's experience with the 540 rotor system--and its decision to continue using it--amply establish government approval of the alleged design defects.").

[9]  The second element of the defense is satisfied as there was no evidence of a manufacturing defect–i.e., the product conformed to the government specifications. *See supra*.  The third element is also satisfied because there is no evidence that Beech knew information about the inadvertent seat harness release that was not known to the government.  Evidence exists that the Navy knew as early as 1985 of this inadvertent risk–i.e., the Navy knew at least as much as the contractors.  *See infra*.

give, or not to give, a warning." 81 F.3d at 575. This is a modified *Boyle* test. State law is displaced if (1) the United States exercised discretion and approved the warnings; (2) the contractor provided a warning that conformed to the approved warnings; and (3) contractor warned about dangers it knew, but the government did not. *See id.*

The district court found that the first element was satisfied in that the Navy approved, changed and edited warnings in the T-34C NATOPS Flight Manual. Although the manual contained no express evaluation of a warning of the specific hazard of inadvertent seat release, the government contractor defense applies because the Navy exercised discretion in approving warnings in the flight manual. *See Tate II*, 140 F.3d at 660 (holding that the government contractor defense applies in "situations in which the government makes the informed decision not to include a specification or require a warning because, in the government's view, one would be unnecessary or problematic."). Inadequacy is not an issue when it is the government's warning in the first place. The district court found that there was no failure to warn claim under Texas law either because the Navy added a release warning to the flight manual 3 years before the incident in this case.

Plaintiff argues that BASI and Beech were under a continuing duty to advise and warn the Navy because they continued to exercise the necessary degree of continuing control, thus creating a continuing duty to advise. *See Bradshaw v. Bell*

-13-

*Helicopter*, 594 S.W.2d 519, 531-32 (Tex. Ct. App.--Corpus Christi 1979, writ ref'd n.r.e.) (finding that because the defendant retained significant control over the safety of the product, it has assumed the duty to warn).  The degree of control necessary to give rise to a continuing duty to advise was not present in this case.  *Cf. Perez v. Lockheed Corp.*, 88 F.3d 340, 341 (5th Cir. 1996) (no retention of control as in *Bradshaw*).

Defendants rebut this argument with the undisputed fact that the Navy knew about the problem at least 10 years before the accident.  Existence of a duty to warn is a question of law and since the Navy knew, contractors had no duty to warn. Contractors need not warn the victim directly.  *See Tate II*, 140 F.3d at 660 ("Under the third conditions of both the *Boyle* and *Tate I* analyses, the government contractor must show that it 'warned the United States of the dangers in the equipment's use about which the contractor knew, but the United States did not.'") (citations omitted).  Since the Navy knew of the danger of the "uncommanded seat release" on the T-34C's PRS, the contractors did not have a duty to warn of that danger.

Defendant BASI argues that since the release problem was an alleged design defect, and since BASI is a maintenance contractor, it has no duty to warn.  *See Firestone*, 927 S.W.2d 608, 613-14 (Tex. 1996).  They did not voluntarily undertake to warn by their attendance at the FEAT meetings.  We agree with BASI's statement that "It stands logic on its head to argue that the Navy's disclosure of a design defect at a meeting BASI

-14-

attended as a maintenance representative triggered a duty of BASI to warn the Navy about the same problem."

## VI.  Negligent Maintenance

Plaintiffs claim that BASI was negligent in maintaining the victim's aircraft because it failed to check for interference between the control stick and buckle and the negligent failure to replace the canopy.[10]  Because BASI did not manufacture the stick, its duty of care arises from its contract with the Navy to perform maintenance services.  Pursuant to *Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116 (Tex. 1976), BASI can only be liable if the victim in this case declined to make his own inspection of the stick, in reliance on the BASI inspection.  *See Taylor*, 544 S.W.2d at 120.  The victim inspected the stick.  The district court also correctly ruled that plaintiff presented no evidence that BASI's failure to inspect the control stick was a proximate cause of the accident.

### CONCLUSION

---

[10]  Plaintiffs also claim negligent maintenance in relation to BASI's failure to replace the canopy of the aircraft when it became brittle.  Plaintiffs assert that a fact issue with regard to the brittleness of the canopy--i.e., whether BASI complied with the government specifications.  The district court held that an expert's speculation is insufficient to create a fact question.  Plaintiff's expert testified that further studies were needed to determine the cause of the canopy's failure to keep the victim in the cockpit.  These studies were never done.  Defendants respond by arguing that plaintiff's expert  could not even conclude that the canopy was what caused the injury.  Even assuming causation, there is no evidence of BASI being negligent--it was within specifications.  The T-34C component maintenance was to be done in accordance with the T-34C maintenance manual that was written by the Navy.

Because we find that the government contractor defense applies and that no genuine issue of material fact exists, we affirm the decision of the district court.

AFFIRMED