Leslie E. Kobayashi, United States District Judge
On May 31, 2017, Defendants The Boeing Company ("Boeing"), Bell Helicopter Textron, Inc. ("Bell"), and Eaton Aerospace LLC ("Eaton" and, collectively, "Defendants") filed a redacted version of their Motion for Summary Judgment Based on the Government Contractor Defense ("Motion"). [Dkt. no. 77.] Defendants filed the unredacted version of the Motion under seal on July 28, 2017. [Dkt. no. 91.] Plaintiffs Michael J. Determan and Charlesa A. Determan, as Personal Representatives of the Estate of Matthew J. Determan, Deceased ("Plaintiffs"), filed redacted versions of their memorandum in opposition on July 17, 2017, and their supplement thereto on July 19, 2017. [Dkt. nos. 81, 84.] Defendants filed their redacted reply on July 24, 2017. [Dkt. no. 87.] Plaintiffs filed unredacted versions of their memorandum in opposition and their supplement under seal on July 28, 2017. [Dkt. nos. 95, 96.] Defendants also filed their unredacted reply under seal on July 28. [Dkt. no. 93.] The Motion came on for hearing on August 7, 2017. On January 31, 2018, this Court issued an entering order informing the parties of the Court's ruling on the Motion. [Dkt. no. 38.] The instant Order supersedes that ruling. Defendants' Motion is hereby granted for the reasons set forth below.
BACKGROUND
Plaintiffs filed their Complaint on March 28, 2016, asserting diversity jurisdiction.
*1008 [Complaint at ¶ 7.] The case arises from the crash of a Marine MV-22 Osprey aircraft ("Subject Aircraft") which resulted in the death of Lance Corporal Matthew Determan ("L.C. Determan"). [Id. at ¶¶ 9, 17.] The Complaint alleges the following claims: negligent design, development, manufacture, construction, assembly, testing, inspection, sale, distribution, failure to remedy potential hazards, and failure to failure to warn of potential hazards ("Count I"); wanton, fraudulent, willful, and/or reckless design, development, manufacture, construction, assembly, testing, inspection, sale, distribution, failure to remedy potential hazards, and failure to failure to warn of potential hazards ("Count II"); and a products liability claim ("Count III"). Plaintiffs pray for: general, special, compensatory, and punitive damages; attorneys' fees and costs; and any other appropriate relief.
Each of Plaintiffs' claims alleges that Defendants: "designed, developed, manufactured, built, assembled, tested, sold and/or distributed the subject MV-22 Osprey aircraft without reasonably precise specifications from the United States government;" [Complaint at ¶¶ 27, 37, 49;] and "failed to ensure that the subject MV-22 Osprey aircraft conformed to design specifications articulated by Defendants and/or the United States government," [id. at ¶¶ 28, 38, 50].
I. Factual Background
The accident at issue in this case occurred on May 17, 2015, when the Subject Aircraft, was making its second attempt to land at the Marine Corps Training Area Bellows on Oahu ("MCTAB" and "the Subject Accident"). [Defs.' Separate & Concise Statement of Fact in Supp. of Motion (redacted) ("Defs.' CSOF"), filed 5/31/17 (dkt. no. 78), at ¶¶ 1-2; Pltfs.' Response to Defs.' CSOF (redacted) ("Pltfs.' CSOF"), filed 7/21/17 (dkt. no. 85-1), at ¶¶ 1-2 (admitting Defendants' ¶¶ 1-2).[1] ] The Subject Aircraft was transporting eighteen Marines, including L.C. Determan, to a landing zone at MCTAB. [Pltfs.' CSOF at Opp. ¶ 2[2] (citing Pltfs.' CSOF (sealed), filed 7/28/17 (dkt. no. 98), Exh. A (U.S. Marine Corps memorandum dated November 6, 2015 regarding the command investigation into the Subject Accident ("Command Investigation Memo") ) at ¶ 2).[3] ]
"On the first attempt to land, the Subject Aircraft's rotors churned up sand and other debris and caused a dust cloud resulting in 'brownout' or 'reduced visibility' (RVL) conditions that engulfed the Subject Aircraft for approximately 35 seconds." [Defs.' CSOF at ¶ 3; Pltfs.' CSOF at ¶ 3.] Plaintiffs add that the Subject Aircraft experienced the brownout after it descended to twenty five feet, and was at an altitude of between 25-35 feet during the thirty-five-second brownout. [Pltfs.' CSOF at Opp. ¶¶ 5-6 (citing Command Investigation Memo at p. 18, ¶ 115 & ¶ 158).] Because of the brownout, the Subject Aircraft conducted a "wave off," climbing in a predetermined pattern to avoid the brownout. It then attempted a second landing. [Id. at Opp. ¶¶ 7-8 (citing Command Investigation Memo at ¶¶ 162, 170).]
*1009 "The second attempt to land caused another brownout that engulfed the Subject Aircraft for approximately another 45 seconds." [Defs.' CSOF at ¶ 4; Pltfs.' CSOF at ¶ 4.] Plaintiffs add that the second brownout occurred after the Subject Aircraft descended to twenty five feet, and it was at an altitude of between 25-110 feet during the forty-five-second brownout. [Pltfs.' CSOF at Opp. ¶¶ 8-9 (citing Command Investigation Memo at ¶¶ 170-71).] While the Subject Aircraft was attempting to climb out of the second brownout, there was a loud bang and three red flashes from the bottom exhaust of the engine on the port side. The Subject Aircraft fell to the ground at a speed of 2100 feet per minute from an altitude of 110 feet. [Id. at Opp. ¶¶ 10-11 (citing Command Investigation Memo at ¶¶ 170, 173-74).] L.C. Determan was removed from the Subject Aircraft and transported to Castle Medical Center, where he was pronounced dead, having suffered blunt force head trauma during the crash. [Id. at Opp. ¶¶ 13-14 (citing Command Investigation Memo at ¶ 228).]
The Marine Corp Command Investigation determined that the Subject Accident was the result of "engine failure caused by ingestion of sand and particulates into the engine compressor." [Defs.' CSOF at ¶ 5; Pltfs.' CSOF at ¶ 5 (admitting Defendants' ¶ 5 "with a clarification").[4] ] Plaintiffs clarify that the sand was reactive, i.e. corrosive, and it "accumulated and physically altered the ability of the engine to ingest air." According to Plaintiffs, if the sand was non-reactive, "the engine likely would not have failed." [Pltfs.' CSOF at ¶ 5 (citing Pltfs.' CSOF (sealed), Exh. C (Risk Assessment of Reduced Visibility Landings, dated 8/19/15) (dkt. no. 98-3) at NAVY15185-92).]
Non-party Rolls-Royce designed, developed, and manufactured the Subject Aircraft's engine, pursuant to a V-22 program that was separate from the government's development contracts with Bell and Boeing. [Defs.' CSOF at ¶ 6; Pltfs.' CSOF at ¶ 6 (admitting Defendants' ¶ 6 "with a clarification").] Plaintiffs emphasize that Rolls-Royce delivered at least one engine to Defendants for testing purposes. [Pltfs.' CSOF at ¶ 6 (citing Pltfs.' CSOF (sealed), Exh. J (dkt. no. 98-10) at BELL008505).] At the time of the 2011 delivery, the engines on the Subject Aircraft "were Government Furnished Equipment ('GFE'), meaning the Navy procured them from Rolls-Royce and had them delivered to Bell-Boeing for installation." [Defs.' CSOF at ¶ 7; Pltfs.' CSOF at ¶ 7.] Plaintiffs' claims in this case are based upon the failure of the Subject Aircraft's Engine Air Particle Separator ("EAPS") system, including, but not limited to the EAPS system's failure to prevent the engine from ingesting dust and particulates. [Defs.' CSOF at ¶ 8; Pltfs.' CSOF at ¶ 8.] An EAPS system is "designed to remove sand, dust, and single foreign objects from the air entering a turboshaft engine," and the system's purpose "is to improve performance of gas turbine engines, which historically performed poorly in air containing sand, dust, ash, dirt, or other particulate." [Defs.' CSOF, Decl. of David Loe (redacted) ("Redacted Loe Decl.") at ¶¶ 4-5.[5] ]
*1010 Plaintiffs emphasize the cause of the Subject Accident was not sand erosion, but the accumulation of sand and dust in the engine during the two landing attempts. As a result of the accumulation, "airflow to the engine was disrupted, which caused a complete compressor failure, ultimately resulting in engine failure." [Pltfs.' CSOF at Opp. ¶¶ 17-18 (citing Command Investigation Memo at p. 26, ¶ 1).] Plaintiffs contend the EAPS system was defective and either caused or contributed to the Subject Accident.
In 1986, the federal government awarded the V-22 Full Scale Development Contract ("FSD Contract") to a joint venture between Boeing and Bell ("Bell-Boeing"). The FSD Contract called for a design that complied with the then-current version of Detail Specification 572-1, a Navy document approved by Naval Air Systems Command ("NAVAIR").[6] Thus, every specification in Detail Specification 572-1 that was incorporated into the FSD Contract was approved by NAVAIR. [Defs.' CSOF at ¶¶ 10-13; Pltfs.' CSOF at ¶¶ 10-13.] The parties agree that, "[w]hen it originally approved and issued Detail Specification SD-572-1, NAVAIR was aware that the ingestion of sand, dust and particulates can degrade turbine engine performance," but they disagree as to the extent of NAVAIR's knowledge at that stage. [Defs.' CSOF at ¶ 14; Pltfs.' CSOF at ¶ 14.] Detail Specification 572-1 § 3.12.5.2.3, which was incorporated into the FSD Contract, "contained NAVAIR's specifications for the V-22" EAPS system, "including efficiency requirements." [Defs.' CSOF at ¶ 15; Pltfs.' CSOF at ¶ 15.] The parties agree that Bell-Boeing and NAVAIR negotiated the separation efficiency requirements that were ultimately included in Detail Specification 572-1. [Defs.' CSOF at ¶ 17; Pltfs.' CSOF at ¶ 17.] However, they disagree as to the extent, if any, of NAVAIR's involvement with Bell-Boeing in the design phase. [Defs.' CSOF at ¶ 16; Pltfs.' CSOF at ¶ 16 (disputing Defs.' ¶ 16).]
The parties agree that, between 1986 and 1988, Bell-Boeing tested a full scale model of the proposed EAPS system for the V-22. [Defs.' CSOF at ¶ 18; Pltfs.' CSOF at ¶ 18.] However, Plaintiffs emphasize that Eaton may have been involved with the testing, and Plaintiffs contend that there is no information about the Navy's and/or NAVAIR's involvement, except for the approval documentation showing conformity with performance standards. [Pltfs.' CSOF at ¶ 18.] At the end of the testing, NAVAIR reviewed and approved a test report, and one of the tested configurations became the NAVAIR-authorized design for the V-22 EAPS system and the only approved configuration for V-22 aircraft. [Defs.' CSOF at ¶¶ 19-21; Pltfs.' CSOF at ¶¶ 19-21.]
The Subject Aircraft was delivered to the Navy pursuant to its procurement contract with Bell-Boeing, contract number N00019-07-C-001 ("the Procurement Contract"). The Procurement Contract required that the Subject Aircraft conform to Drawing Number 901-100-011 and the specifications in the then-current version of Detail Specification 572-1-3. Detail *1011 Specification 572-1-3 contained the same EAPS system efficiency specifications as in Detail Specification 572-1 and the FSD Contract. [Defs.' CSOF at ¶¶ 22-24; Pltfs.' CSOF at ¶¶ 22-24.] The parties agree that:
The NAVAIR-approved V-22 design set forth in the drawings and other documents incorporated in Drawing 901-100-011, and which thus constitutes the design required by the procurement contract, includes the design features of the EAPS system that was reviewed and approved by NAVAIR in conjunction with testing of the EAPS system from 1986 through 1988, every modification of which that could affect the functional or technical requirements of the EAPS system had been reviewed and approved by NAVAIR.
[Defs.' CSOF at ¶ 26; Pltfs.' CSOF at ¶ 26.] The design also includes the "Critical Item Development Specification for Engine Air Particle Separator Blower 901-947-258 and Bell/Boeing Source Control Drawing 901-362-203, and which thus constitutes the design required by the procurement contract," and "include[s] the blowers that were designed, qualified, and supplied specifically for the V-22 by defendant Eaton, and approved by NAVAIR." [Defs.' CSOF at ¶ 27; Pltfs.' CSOF at ¶ 27.]
NAVAIR's designees conducted inspections and testing-including flight tests-to, inter alia , verify conformity with Drawing Number 901-100-011 and Detail Specification 572-1-3. Thereafter, Bell-Boeing delivered the Subject Aircraft to the Navy on April 29, 2011. [Defs.' CSOF at ¶¶ 28-30; Pltfs.' CSOF at ¶¶ 28-30.] On that date, the Navy executed a Form DD250 "Material Inspection and Receiving Report" for the Subject Aircraft ("Subject Form DD250"). [Defs.' CSOF at ¶ 31; Pltfs.' CSOF at ¶ 31.] Defendants state the Subject Form DD250 "confirms that, subject to specifically identified exceptions,[7] the Subject Aircraft conformed to Drawing Number 901-100-011 and with Detail Specification SD-572-1-3." [Defs.' CSOF at ¶ 32.] Plaintiffs assert other documentation calls into question the EAPS system's conformity with government specifications.
The Navy issues the Naval Air Training and Operating Procedures Standardization manual for the V-22 ("V-22 NATOPS Manual"). The V-22 NATOPS Manual contains instructions and procedures for V-22 operation. [Defs.' CSOF at ¶¶ 34-35; Pltfs.' CSOF at ¶¶ 34-35 (admitting Defs.' ¶ 34 and the portion of Defs.' ¶ 35 described here).]
DISCUSSION
The sole issue presented in the Motion is whether the government contractor defense precludes Plaintiffs' claims against Defendants.
The Supreme Court established the framework of the government contractor defense in Boyle v. United Technologies Corp., 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). There, the Court explained that procurement of military equipment involves "uniquely federal interests" that sometimes preempt a plaintiff's product liability claims against government contractors. Id. at 504, 108 S.Ct. 2510. To invoke the defense successfully, the contractor must establish three elements: "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." Id. at 512, 108 S.Ct. 2510....
Getz v. Boeing Co., 654 F.3d 852, 860-61 (9th Cir. 2011). In addition to claims failing *1012 within the negligent design and manufacture category, the instant case involves claims failing within the failure-to-warn category. Although the government contractor defense may apply to state law failure-to-warn claims, because the Boyle involved claims alleging design or manufacturing defects, the analysis does not adequately address the preemption of failure-to-warn claims. Getz, 654 F.3d at 866. The Ninth Circuit has modified the Boyle analysis for failure-to-warn cases and held that
the contractor must show that it "act[ed] in compliance with 'reasonably precise specifications' imposed on it by the United States" in deciding whether "to provide a warning." [Butler v. Ingalls Shipbuilding, Inc., 89 F.3d 582, 586 (9th Cir. 1996) ] (internal alteration omitted). As the Seventh Circuit has explained:
[W]hen state law would otherwise impose liability for a failure to warn, that law can be displaced when the contractor can show that: (1) the government exercised its discretion and approved certain warnings; (2) the contractor provided the warnings required by the government; [and] (3) the contractor warned the government about dangers in the equipment's use that were known to the contractor but not to the government.
Oliver [v. Oshkosh Truck Corp.], 96 F.3d [992,] 1003-04 [ (7th Cir. 1996) ]. This means that the contractor must demonstrate that the government "approved reasonably precise specifications" thereby limiting the contractor's "ability to comply with [its] duty to warn." Snell [v. Bell Helicopter Textron, Inc.], 107 F.3d [744,] 749 [ (9th Cir. 1997) ] (internal quotation marks omitted).
Id. at 866-67 (some alterations in Getz ).
I. Reasonably Precise Specifications
As to the first Boyle element, the Ninth Circuit has stated:
[T]he government's approval of a particular specification must be more than a cursory "rubber stamp" approving the design. [Snell v. Bell Helicopter Textron, Inc.,] 107 F.3d 744, 748 (9th Cir. 1997). Rather, approval must result from a "continuous exchange" and "back and forth dialogue" between the contractor and the government. Butler v. Ingalls Shipbuilding, Inc., 89 F.3d 582, 585 (9th Cir. 1996). When the government engages in a thorough review of the allegedly defective design and takes an active role in testing and implementing that design, Boyle's first element is met. Id.
Id. at 861. For the government contractor defense to apply, the specifications cannot merely be performance standards. Id. at 862 (citing In re Haw. Fed. Asbestos Cases, 960 F.2d 806, 813 (9th Cir. 1992) (to qualify for the government contractor defense, approved specifications must do more than merely identify "a certain level of performance") ).
A. Design and Manufacturing Defect
The government contractor defense does not apply where the government "orders, by model number, a quantity of stock [products] that happen to be equipped with" a particular feature. Boyle, 487 U.S. at 509, 108 S.Ct. 2510. In this case, the United States military is the only entity that has purchased and flown the V-22. [Redacted Pauling Decl. at ¶ 29.] The government conceived the concept that became the V-22 and began a design effort for an aircraft that combined the features of a helicopter with that of a turboprop aircraft. In 1983, it awarded a contract for the preliminary design phase to Bell-Boeing. The FSD Contract followed at the conclusion of that phase, followed in 1994 by the V-22 Engineering and Manufacturing Contract between the government and Bell-Boeing ("EMD Contract"), which required additional design changes. Flight *1013 testing and evaluation went on until 2005, and the production phase began. [Id. at ¶¶ 10-12.] "In accordance with the test plan, military representatives were informed of the test schedules, had an opportunity to witness the tests, and did in fact witness many of the tests." [Defs.' CSOF, Decl. of Dale Sowers (redacted) ("Redacted Sowers Decl.") at ¶ 25.[8] ]
Even if "the government was significantly involved in and approved specifications for the design of the entire" aircraft, that is not enough-the government must have approved reasonably precise specifications as to the design of the particular feature at issue in this case, i.e. the EAPS system. See Snell, 107 F.3d at 747. As previously noted, the parties agree § 3.12.5.2.3 of Detail Specification 572-1-which was included in the FSD Contract, contains NAVAIR's specifications for the V-22 EAPS system, including efficiency requirements. A model of the proposed EAPS system was tested, and NAVAIR ultimately authorized one of the tested configurations to be the only approved design for the V-22 EAPS system. Detail Specification 572-1-3 was incorporated into the Procurement Contract, and any modification to the EAPS system affecting its functional or technical requirements had to be approved by NAVAIR.
Defendants submit evidence that Bell-Boeing "was not authorized to change any requirement of the Procurement Contract," and NAVAIR "had exclusive authority to change" the contract's requirements. [Defs.' CSOF, Decl. of Aaron Weick (redacted) ("Redacted Weick Decl.") at ¶ 9.[9] ] Further, "[t]hroughout the production phase, additional engineering changes to SD-572-1-3 were proposed and approved." [Id. at ¶ 10.] Specific examples of engineering changes that NAVAIR approved are described under seal. [Defs.' CSOF (sealed), Decl. of Aaron Weick ("Sealed Weick Decl.") at ¶¶ 10.a-c, Exhs. F-H (dkt. nos. 92-10 to 92-12).] The government exclusive authority is evidence that the government, not Bell-Boeing, exercised its discretion in determining design changes for the EAPS system during the development of the V-22. Further, the section of Detail Specification 572-1-3 "that specifies the required particle separation efficiency of the EAPS system has remained unchanged since the original" FSD Contract, prepared by the government. [Redacted Weick Decl. at ¶ 11.]
Defendants also present evidence that the efficiency requirements for the EAPS system "were the result of negotiations between Bell-Boeing and NAVAIR. The Government, through NAVAIR, ultimately adopted a specification for the EAPS system separation efficiency that balanced its design goals with its developmental timeline and operational requirements." [Redacted Sowers Decl. at ¶ 17.] "The specifications for the particle separator system ... were specifically intended to minimize sand/dust ingestion while balancing this objective against the Navy's mission needs in terms of engine efficiency and performance." [Redacted Loe Decl. at ¶ 8.] Other types of sand/dust removal technologies were available to the Navy during the development of the V-22, but ultimately the EAPS system was incorporated because, "[i]n general, filtration or barriers were more effective in preventing sand/dust *1014 from reaching the engine, but they had a more significant impact on engine performance than 'separation'-based technologies like the EAPS design." [Redacted Pauling Decl. at ¶ 16.] Thus, the efficiency specifications for the EAPS system were more than mere performance standards; they were directly related to the government's design specifications for the V-22 in general.
Mr. Sowers's declaration also includes a description of the negotiations between Bell-Boeing and NAVAIR regarding the EAPS systems separation efficiency requirements, including: NAVAIR's original proposal; meetings between NAVAIR representatives, Bell-Boeing personnel, and others in which the feasibility of the proposal was discussed, as well as a counterproposal; and the government's ultimate determination of the appropriate balance between feasibility and mission requirements. [Redacted Sowers Decl. at ¶¶ 17-17.c.] "While the EAPS system was in development, Bell-Boeing engineers would regularly speak by telephone and meet in person with NAVAIR technical specialists." [Id. at ¶ 13.] Defendants submit, under seal, a description of the EAPS system, with illustrations. [Defs.' CSOF (sealed), Decl. of Dale Sowers ("Sealed Sowers Decl.") at ¶ 19 & Fig. 1.] Each of the V-22 aircraft Bell-Boeing has delivered to the military, including the Subject Aircraft, has been equipped with the EAPS system, and the EAPS systems have been designed according to the NAVAIR-approved specifications. [Redacted Loe Decl. at ¶ 10.]
Plaintiffs argue that the first Boyle factor is not met because the government did not provide reasonably precise specifications governing the design of the EAPS system regarding the defect in the system that resulted in the Subject Accident-i.e. the failure to prevent the accumulation of reactive sand and dust in the Subject Aircraft's engine. Plaintiffs' argument is misplaced. The first Boyle factor, as described in Getz, looks at whether the government approved reasonably precise specifications as to the design of the allegedly defective feature-here the EAPS system. See Getz, 654 F.3d at 860-61. The first Boyle factor does not require that the government approved reasonably precise specifications as to the particular function of the allegedly defective feature that failed and resulted in the Subject Accident. For example, in the analysis os the second Boyle element, the Ninth Circuit noted the plaintiffs in Getz"assert[ed] that 'the failure or shutdown of one engine' was not supposed to 'compromise the remaining engine or safety of flight systems.' The problem for [the p]laintiffs is that [n]onconformance with a specification means more than that the ultimate design feature does not achieve its intended goal." 654 F.3d at 865 (some alterations in Getz ) (some citations and internal quotation marks omitted) (citing Oliver, 96 F.3d at 1000 (mere allegation of nonperformance is insufficient) ). Similarly, the first element of the Boyle analysis is not limited to the function that failed in the accident at issue and whether the government issued reasonably precise specifications controlling that function. This Court is required to consider whether the government issued reasonably precise specifications as to the EAPS system itself.
Even viewing the record in the light most favorable to Plaintiffs,[10] there are no genuine issues of material fact as to the first Boyle factor. See Fed. R. Civ. P. 56(a)
*1015 (stating that a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law"). Defendants have carried their burden to establish that the United States approved reasonably precise specifications for the EAPS system.
B. Failure to Warn
Plaintiffs' failure-to-warn theory is that Defendants failed to provide adequate warnings about the potential defects in the Subject Aircraft-in particular the EAPS system-and the Subject Aircraft was unreasonably dangerous because of, inter alia , the lack of adequate warnings. Plaintiffs allege L.C. Determan suffered injuries and died because the Subject Aircraft was unreasonably dangerous. See, e.g., Complaint at ¶¶ 24, 29-30.
As previously noted, the V-22 NATOPS Manual contains instructions and procedures for V-22 operation. The V-22 NATOPS Manual "provides specific warnings, cautions, and notes for flight operations in normal, emergency, and inclement weather conditions, including operations in RVL conditions." [Redacted Pauling Decl. at ¶ 23.] It is issued by the Navy, which "prepares, or thoroughly reviews and then approves, all the information it contains" and "regularly review[s] and update[s]" it "to incorporate lessons learned from operations." [Id. ¶ 24.] The V-22 NATOPS manual states: "Compliance with the stipulated manual requirements and procedures is mandatary except as authorized herein." [Defs.' CSOF, Declaration of David G. Lassen ("Lassen Decl."), Exh. T (excerpt of V-22 NATOPS Manual) (dkt. no. 78-9) at BELL 036108.] The V-22 NATOPS Manual contains warnings, cautions, and notes regarding operation of the V-22. Warnings, cautions, and notes are all "[e]xplanatory information about an operating procedure, practice, or condition, etc.," but a warning addresses those "that may result in injury or death, if not carefully observed or followed." [Id. at BELL 036178.]
As a result of an August 2013 accident involving a V-22, the V-22 NATOPS Manual's procedures for operating the V-22 in RVL conditions were changed prior to the Subject Accident. [Redacted Pauling Decl. at ¶ 24.] As previously noted, the parties agree the 2013 accident was the result of a compressor stall and engine shut down. NAVAIR's April 2015 interim charge number 78 ("IC 78") added the following to the V-22 NATOPS Manual:[11]
-a warning that "hovering in a dust cloud or repeated RVLs will degrade engine performance or lead to engine failure;" [Defs.' CSOF at ¶ 37; Pltfs.' CSOF at ¶ 37;] and
-a section "stating that continuing to operate in brownout conditions for more than 60 seconds 'may lead to an uncommanded engine shutdown due to excessive sand ingestion into the engine causing a compressor stall,' " [Defs.' CSOF at ¶ 38; Pltfs.' CSOF at ¶ 38].
Viewing the record in the light most favorable to Plaintiffs, there is no genuine issue of material fact as to the first element of the Getz modified Boyle analysis. Defendants have met their burden as to the first element because the government exercised its discretion and gave the only warnings regarding the V-22 in the V-22 NATOPS Manual.
II. Conformity with Reasonably Precise Specifications
A. Design/Manufacturing Claims
As to the second Boyle element, the Ninth Circuit has held that:
*1016 [T]he operative test for conformity with reasonably precise specifications turns on whether "the alleged defect ... exist[ed] independently of the design itself." Miller v. Diamond Shamrock Co., 275 F.3d 414, 421 (5th Cir. 2001) (internal alteration omitted) (internal quotation marks omitted). "To say that a product failed to conform to specifications is just another way of saying that it was defectively manufactured." Harduvel v. Gen. Dynamics Corp., 878 F.2d 1311, 1321 (11th Cir. 1989). Therefore, absent some evidence of a latent manufacturing defect, a military contractor can establish conformity with reasonably precise specifications by showing "[e]xtensive government involvement in the design, review, development and testing of a product" and by demonstrating "extensive acceptance and use of the product following production." Kerstetter v. Pac. Scientific Co., 210 F.3d 431, 435-36 (5th Cir. 2000).
Id. at 864 (some alterations in Getz ). Conformity with design specifications is not the same thing as failure to meet performance goals.
The government contractor defense does not depend upon satisfaction of some general performance goal. Otherwise, "[a] product involved in a design-induced accident would, as a definitional matter, always be deemed not to comply with such generalities since no performance specifications approved by the government would purposely allow a design that would result in an accident." Kleemann v. McDonnell Douglas Corp., 890 F.2d 698, 703 (4th Cir. 1989). For the defense to have any substance, "[n]onconformance to precise specifications must mean more than that the design does not work in compliance with some 'general admonition against an unwanted condition.' " Id. at 703, quoting Harduvel, 878 F.2d at 1319 n.3....
Id. at 865 (some alterations in Getz ).
As previously noted, the parties agree that the Navy executed the Subject Form DD250. Defendants submit evidence that, after the Navy's inspection and evaluation of the Subject Aircraft, the Subject Form DD250 was submitted by Bell and approved by an authorized representative of the Navy, pursuant to a NAVAIR letter of acceptance authority ("NAVAIR Acceptance Letter"). The NAVAIR Acceptance Letter is attached to the Subject Form DD250 as Attachment 1.[12] [Redacted Loe Decl. at ¶ 14.] Defendants assert that, based on the Subject Form DD250 and the NAVAIR Acceptance Letter, the Subject Aircraft's EAPS system complied with government specifications at the time the Subject Aircraft was delivered. As previously noted, none of the exceptions reflected in the DD250 materials for the Subject Aircraft related to the EAPS system. In addition, Defendants present testimony that "no nonconformity in the EAPS system of the Subject Aircraft has ever been called to the attention of Bell Boeing." [Redacted Weick Decl. at ¶ 14.]
The Ninth Circuit has recognized the Form DD250 "officially certifie[s] 'that all articles delivered [were] inspected and found to conform in all respects ... to all applicable blueprints, specifications, and standards.' " Getz, 654 F.3d at 864 (some alterations in Getz ). Further, in Getz, the Ninth Circuit held, because the plaintiff failed to "present any evidence of a latent manufacturing defect that was undiscovered at the time of acceptance, the government's careful scrutiny and subsequent certification of the [product] provide sufficient proof of conformity." Id.
*1017 Plaintiffs argue there are genuine issues of material fact as to the second Boyle element because two documents, produced by the Navy, show the EAPS system design does not meet the government's required efficiency specifications. One document is a Bell-Boeing document dated April 26, 2011, and the other is a Bell-Boeing document dated October 14, 2015. [Exh. "M" Filed under Seal to Pltfs.' Suppl. Opp. to Def.'s Motion for Summary Judgment, filed 7/28/17 (dkt. no. 97); Pltfs.' CSOF (sealed), Exh. E (dkt. no. 98-5).] These documents do not create a genuine issue of material fact as to the second Boyle element.
Defendants submit testimony that the April 26, 2011 document's "EAPS efficiency numbers are based upon analysis/simulation as opposed to qualification test data gathered in a controlled test environment." [Reply (redacted), Decl. of Nickolas A. Kacprowski, Exh. X (Decl. of David Loe (redacted) ("Redacted Loe Reply Decl.") ) (dkt. no. 87-2) at ¶ 9.] Because the April 26, 2011 document addresses the analysis or simulation of a generic EAPS system, it does not create a genuine issue of material fact as to whether the EAPS system on the Subject Aircraft complied with the government's specifications for the EAPS system.
As to the October 14, 2015 document, which addresses whether the EAPS system should be replaced with "an inlet barrier filter system," Defendants submit testimony that the document compares the separation efficiency of the two designs, but the comparison "is not based on the test sand required by SD-572-1." [Id. at ¶ 8.] Mr. Loe further states that the government's requirements for the V-22 never included a requirement for the type of particle separation efficiency described in the October 14, 2015 document. Because the document is "based on different test conditions," it "has no technical validity." [Id. at ¶ 10.] This Court agrees and finds the October 14, 2015 document fails to raise a genuine issue of material fact as to whether the EAPS system on the Subject Aircraft complied with the government's specifications for the EAPS system.
Even viewing the record in the light most favorable to Plaintiffs, there is no genuine issue of material fact as to the second Boyle element. Defendants have carried their burden to prove the EAPS system in the Subject Aircraft conformed to government specifications.
B. Failure to Warn Claims
Plaintiffs have not presented any evidence of other warnings that were given regarding the V-22 other than the V-22 NATOPS Manual. Insofar as the V-22 NATOPS Manual contains the only warnings given about V-22 and the government controls the contents of the manual, there are no genuine issues of material fact as to the second element of the Getz modified Boyle analysis. Defendants have met their burden to prove that the government's required warnings about the V-22 were given.
III. Warning about Dangers Not Known to the Government
With regard to the third Boyle element, " 'a government contractor is only responsible for warning the government of dangers about which it has actual knowledge.' " Getz, 654 F.3d at 865 (quoting Kerstetter, 210 F.3d at 436 ). The third element in the Getz modified Boyle analysis is the same as the third Boyle element.
Defendants submit testimony from Mr. Pauling-who worked for NAVAIR during the V-22 development-that:
The aviation industry generally, and NAVAIR specifically, know that ingestion of sand and dust can degrade turbine engine performance and cause *1018 compressor stalls and engine shut-downs, and so have included performance specification design requirements to be tested that demonstrate acceptable performance in this environment under reasonable circumstances. From before the beginning of my career at NAVAIR in 1975, aircraft design and procurement has been informed by this well-known danger. Years before the inception of the V-22 program, NAVAIR engineers, including me, knew that the appropriate mitigation of this risk depended on the aircraft/engine integrated design as well as operational standards and maintenance practices. Specifically, we knew that the impact of sand and dust ingestion on performance depended on the following: first, the environment·in which the aircraft would be operated; second, the design of the engine air intake system and, more specifically, the method selected for sand/dust filtration or extraction; and third, the design of the engine with respect to its tolerance for sand/dust ingestion.
....
18. The NAVAIR engineers who prepared, reviewed, and ultimately approved the V-22 design specifications were aware of dangers of sand/dust ingestion and, by specification, required design risk mitigation. The contents of the V-22 Detail Specification make it clear that knowledge of this risk informed the Navy's design and development program from its inception.
[Redacted Pauling Decl. at ¶¶ 14, 18.] Defendants also provide similar testimony from Bell-Boeing's perspective. [Redacted Loe Decl. at ¶ 7.]
As previously noted, the V-22 is only manufactured for the government. Thus, "the Government is the first entity to learn about any danger in the aircraft's EAPS. Whatever knowledge Bell and Boeing gain about such dangers must necessarily come from the Government itself." [Redacted Pauling Decl. at ¶ 30.] For example, the government was aware of the August 2013 accident and issued IC 78 as a result, but the government has not changed the EAPS system specifications over the years. The government was therefore aware of the potential problem prior to the Subject Accident and made changes to the V-22 NATOPS Manual that it deemed appropriate, while declining to make design changes. Defendants were not required to warn of dangers regarding the V-22 EAPS system that were already known to the government. See Getz, 654 F.3d at 866 ("Because the MH-47E is operated exclusively by the United States Army, government personnel were necessarily aware of the potential problem prior to the crash. Again, Boyle does not require government contractors to warn of dangers that were already known to the United States." (citing 487 U.S. at 512, 108 S.Ct. 2510 ) ). Plaintiffs have not presented any evidence indicating Defendants knew the V-22 EAPS system presented dangers that the government was not aware of. Thus, there were no warnings about the use of the EAPS system which Defendants were required, but failed, to give.
Even viewing the record in the light most favorable to Plaintiffs, there is no genuine issue of material fact as to the third Boyle element. Defendants have carried their burden as to that element.
IV. Summary
Defendants have carried their burden of proof as to each element of the Boyle analysis for Plaintiffs' design/manufacturing defect category of claims, and Defendants have carried their burden as to each element of the Getz modified Boyle analysis for Plaintiffs' failure-to-warn category of claims. Defendants are therefore entitled to judgment as a matter of law as to *1019 all of Plaintiffs' claims against them, based on the government contractor defense.[13]
CONCLUSION
On the basis of the foregoing, Defendants' Motion for Summary Judgment Based on the Government Contractor Defense, filed May 31, 2017, is HEREBY GRANTED.
The Clerk's Office is DIRECTED to enter final judgment in favor of Defendants on March 21, 2018 , unless Plaintiffs file a motion for reconsideration of this Order by March 16, 2018 .
IT IS SO ORDERED.

Plaintiffs filed their original (redacted) concise statement on July 17, 2017. [Dkt. no. 82.] On July 21, 2017, they filed a notice that they were withdrawing and replacing docket number 82. [Dkt. no. 85.]

"Opposition ¶" refers to the paragraphs of Plaintiffs' CSOF that support Plaintiffs' memorandum in opposition, as opposed to the paragraphs that respond to Defendants' CSOF.

Although the Command Investigation Memo and all of Plaintiffs' other exhibits are filed under seal, the discussion of Plaintiffs' exhibits in Plaintiffs' filings related to the Motion is not sealed.

See also Defs.' CSOF, Decl. of David V. Pauling (redacted) ("Redacted Pauling Decl.") at ¶ 2 ("According to the Navy's Command Investigation Report for the accident, ingestion by the left engine of sand and dust in a quantity that eventually resulted in an engine compressor stall and engine shut-down was one of several factors contributing to the accident."). Mr. Pauling was the head of NAVAIR's Propulsion and Power Engineering department through much of the V-22 development program. [Id. at ¶¶ 6-7.]

David Loe has been Bell's "Team Lead for V-22 Aircraft Systems" since July 2013. [Redacted Loe Decl. at ¶ 1.] From October 2010 to July 2013, he was Bell's "Chief Engineer for Aircraft Systems Analysis and Engine Integration," and from October 1996 to October 2010, he was Bell's "Principal Engineer for Propulsion Analysis and Integration." [Id. ]

The parties agree NAVAIR "is responsible for acquisition and support of all aircraft, weapons and systems operated by Marines and Sailors." [Defs.' CSOF at ¶ 12; Pltfs.' CSOF at ¶ 12.] Defendants also present evidence that NAVAIR "develop[s], field[s], maintain[s], and improv[es] the Navy's aircraft and weapons systems." [Redacted Pauling Decl. at ¶ 5.]

The parties agree none of the specified exceptions on the Subject Form DD250 related to the EAPS system. [Defs.' CSOF at ¶ 33; Pltfs.' CSOF at ¶ 33.]

Dale Sowers has held various positions with Bell since 1981. Until February 1994, he was "an Associate Engineer to Senior Engineering Specialist for Power Plant Installation and ECS Environmental Control Systems" and, in that capacity, he worked on the V-22 project and participated in the testing and certification of the EAPS system. [Redacted Sowers Decl. at ¶ 1.]

Aaron Weick has been employed by Bell in various positions since July 1997. He has "supported the V-22 Program since 2011." [Redacted Weick Decl. at 1.]

"We review a grant of summary judgment de novo and must determine, viewing the facts in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact." Crowley v. Bannister, 734 F.3d 967, 976 (9th Cir. 2013) (citations and quotation marks omitted).

Exhibit T to the Lassen Declaration includes an excerpt of the V-22 NATOPS Manual, dated July 1, 2014, as well as IC 78. [Dkt. no. 78-9.]

The Subject Form DD250 is sealed Exhibit I to the Lassen Declaration. [Dkt. no. 92-13.]

In light of this conclusion, it is not necessary to address the issue of whether Plaintiffs' claims against Eaton fail because Eaton only manufactured the blowers for the EAPS system. See, e.g., Redacted Loe Decl. at ¶ 16 (stating that "[t]he EAPS system on the Subject Aircraft included four EAPS blowers supplied by Eaton" and "I have reviewed the Plaintiff's [sic] Complaint, which alleges that Eaton 'designed, developed, manufactured, built, assembled, tested, sold and/or distributed the engine air particle separator (EAPS) and/or engine filtration system for the subject MV-22 Osprey aircraft.' That allegation is incorrect. Eaton supplied only the blowers ....").